RYAN, Respondent, v. CHICAGO, M. & ST. P. RY. CO., Appellant.

(220 N. W. 905.)

(File No. 5786.   Opinion filed August 10, 1928.)

*Ed. L. Grantham,* of Rapid City, *H. O. Hepperle,* of Aberdeen, and *Mather, Stover & Mather,* of Watertown, for Appellant.
*Loucks, Hasche & Foley,* of Watertown, for Respondent.

BURCH, P. J. Plaintiff brings this action against defendant in trover for conversion of a carload of hogs, shipped by plaintiff from Watertown, S. D., to Worthing, S. D. Judgment for plaintiff, and defendant appeals from the judgment, and an order overruling a motion for a new trial.

The hogs were billed under the usual live stock shipper's contract, naming respondent, Ryan, as the shipper, and also as the consignee. Ryan did not accompany the shipment, and when the car arrived at Worthing it was unloaded, and a few hours later the hogs were delivered by appellant's agent at Worthing to G. M. Burney, who receipted for them by signing the waybill, "H. Ryan by G. M. Burney." Respondent brings the action on the theory that the delivery to Burney was unauthorized, and that thereby the railroad company became liable for the value of the hogs as for conversion. Respondent cites many cases holding that a wrongful delivery of freight by a carrier constitutes a conversion of such freight by the carrier for which an action may be maintained. He cites cases involving live stock shipments, where delivery was made to the wrong person, or to an unauthorized person, or to persons to whom a shipment was made with draft attached to a bill of lading. Appellant makes no criticism of the authorities cited, but claims this case is not within the rule laid down in any of them, and that in this case there was no wrongful delivery. Thus is presented for our first consideration the character of the delivery.

Ryan was a hog buyer at Watertown. Burney was a farmer and feeder in the vicinity of Worthing. Shortly before the car was shipped, Burney and Ryan had a conversation over the telephone, wherein Burney asked Ryan to get him a carload of stock hogs, and directed Ryan to draw on him for payment of the consignment. The price was agreed on, and on the 28th of November, 1922, Ryan consigned the carload in question to Worthing to himself as consignee. Ryan then took his shipper's contract to the Security National Bank of Watertown, which was financing him in his buying operations, and the bank thereafter drew a draft upon Burney, attached it to the shipper's contract, and sent it for collection to the First National Bank of Centerville. The draft and contract arrived at Centerville December 1st. The car arrived at Worthing November 29th, and was unloaded at the stockyards. It is claimed that at that time, one hog was dead and two others ap-

peared to be sick. The agent says that he inquired for Ryan, but was unable to locate him, and that later in the day Burney inquired about a carload of hogs he was expecting, and, on being told of the Ryan shipment, said that was the car expected. There being some question about the health of the hogs, Dewey Burney, son of G. M. Burney, claims to have called Ryan by telephone and told him the hogs appeared sick.   ·

Dewey Burney's testimony concerning this conversation, taken from appellant's abstract, is as follows:

"He .(Ryan) said they could not have the cholera, because he had shipped them out of a new yard, and I told him that we did not have any use for any that had the cholera, that we did not have any way of saying they had the cholera, some of them were sick, and we would take the hogs and hold up the payment of the draft two or three days and see how they came out, and he said he did not want to do that because the people at the bank would not like to have that done, and I told him then we could not accept the hogs because we thought they were sick. He said he wanted us to accept the hogs because he had gone to considerable expense to get them down there, and we accepted the hogs that way—we would hold up the draft."

The hogs were hauled away by the Burneys, they paying the freight and receipting for the delivery as agent of Ryan. It is claimed that a large number of the hogs died, and that they had cholera. The draft was not paid, but was returned by the First National Bank of Centerville, with letter under date December 4, 1922, saying: "We are returning draft thirteen hogs dead balance sick with cholera." The telephone conversation by Dewey Burney was denied, and therefore became a question of fact for the jury to determine. The station agent claims to have called up the telephone operator at Worthing and ascertained that Dewey Burney had a telephone conversation with Ryan at Watertown, as he said, but the truth of the station agent's testimony is for the jury as well as all testimony concerning care or negligence of the agent in making the delivery to Burney, and, in view of the verdict, cannot be considered in determining whether or not the delivery was wrongful. If there was express authority, as claimed in the telephone conversation, there was of course no wrongful delivery. Appellant's agent at Worthing does not claim to have had any di-

rect communication with Ryan. Whether or not the delivery in this case was wrongful, it being undisputed that the delivery was not to Ryan, the consignee, in person, depends upon the authority of Burney to receive the shipment for and on behalf of Ryan. If he was so authorized, there can be no recovery from appellant; if not, the delivery was wrongful, and a recovery may be had unless the company has some defense to a wrongful delivery. There can be no doubt that the transaction was intended to be a cash deal and that Burney was to honor a sight draft to be drawn upon him. He admits that he directed the drawing of a draft. Before shipping the hogs, the Security National Bank made inquiry as to Burney's responsibility, and received assurance from his bank that he was good. There is now no contention that Burney was not financially responsible. The condition of the hogs was the only cause assigned for the dishonor of the draft.

Ryan did not at any time personally ask for or appear to receive a delivery of the hogs. The hogs were shipped in response to an order from Burney, were for Burney, and Ryan says he expected Burney to take care of the shipment from that end of the line. Ryan did not accompany the shipment, although he contracted to unload and care for the hogs on their arrival. Burney evidently understood that he was to take care of the hogs as Ryan says he expected him to do, for he called for them and took charge. What was said or done by the parties to arrive at this understanding is not plain from the record, but that Burney had authority to receive the hogs is admitted by Ryan, although Ryan says the authority was conditional depending upon Burney's first paying the draft. But he does not tell of any conversation or show any writing which limited Burney's authority. It nowhere appears that Burney knew he was expected to pay the draft before taking charge. The fact that the draft was delayed two days after the arrival of the shipment at Worthing; was drawn and sent to Centerville for collection and not to Worthing; that Ryan made no effort to care for the shipment in the meantime, nor to notify the railway company of the limitation on Burney's authority, but left the care to Burney as originally planned—all tend to show that Burney had authority to at least conditionally receive the hogs for Ryan. On the day the shipment was made, Ryan wrote Burney that he was

sending the hogs, and said in his letter, "I made draft on you through First National Bank of Centerville, S. D., and billed the car to Worthing." But he did not therein say anything about payment of the draft before getting the hogs. After Burney received the hogs, Ryan never complained that Burney had no right to get them when he did, but all later negotiations between Ryan and Burney were in regard to the diseased condition of the hogs. No demand for delivery of the hogs to any one else was ever made upon the railway company, and, so far as the record discloses, no complaint on this score was made until this action was commenced some months after. The mere fact that the sale was a cash sale to be handled by draft does not show that Burney was not authorized to receive the shipment without first paying the draft. Both expected the draft to be paid, but whether before or after the receipt of the hogs is not stressed. Ryan having admitted that Burney was the man to whom they were shipped and to whom they were to be delivered, and not having shown any limitation upon his authority to accept their delivery, has failed to show a wrongful delivery by the railway company.

Respondent argues that, where a sale is for cash, payment and delivery are concurrent and mutually dependent acts, and, if a vendor makes delivery in expectation of immediate payments, such delivery is conditional only, and he does not thereby divest himself of title, but may reclaim the goods if payment be not made. Many authorities are cited, and a considerable portion of his brief is devoted to this proposition. Conceding respondent's position, that does not help him, for, though the delivery be conditional by the vendor, it is nevertheless a delivery by the vendor sufficient to relieve the carrier. Ryan could not deliver the hogs to Burney conditionally without accepting delivery from the carrier. Ryan's right to recover the payment for the hogs from Burney is not before us. So far as the carrier is concerned, it makes no difference whether the title passed to Burney or remained in Ryan if the carrier delivered the property to the consignee or his authorized agent.

Respondent contends that the shipment was made upon a bill of lading, that the bill of lading was attached to the draft as security for its payment, and a delivery of the freight without regard to the bill of lading or collection of the draft constituted a wrong-

ful delivery. Shipments are often made in that manner, and the mode of handling such transactions is quite generally known by business men. The value of the bill of lading as security depends upon the character of the instrument, and rests in the fact that a bill of lading is evidence of title, and its surrender is required by the carrier upon delivery of the freight. No doubt live stock shipments as other shipments may be made in that manner, and it was held in North Penn. Ry. Co. v. Commercial Nat. Bank, 123 U. S. 727, 8 S. Ct. 266, 31 L. Ed. 287, that the custom of a carrier to deliver live stock shipments without production of the bill of lading would not relieve a carrier from liability for a wrongful delivery. Cases treating of the liability of carriers for wrongful delivery of freight, when a bill of lading was used as security for the collection of a draft to which it was attached, are all readily distinguishable from the case at bar. In such cases the bills of lading were treated as negotiable, quasi negotiable, or assignable instruments, whereby title to the freight passed to the bearer of the instrument or upon the order of the consignee indorsed thereon. Such an instrument would of course be the authority upon which a delivery could be made, and a delivery by a carrier without production of the instrument would be at the carrier's peril.

▮ A bill of lading is defined by our statute, section 1131, R. C. 1919, as follows:

"A bill of lading is an instrument in writing, signed by a carrier or his agent, describing the freight so as to identify it, stating the name of the consignor, the terms of the contract for carriage, and agreeing or directing that the freight be delivered to the order or assigns of a specified person at a specified place."

Section 1132 provides that title to the freight passes by indorsement of the bill of lading, and a good-faith indorsee, for value, in the ordinary course of business, holds the title "with like effect and in like manner as in the case of a bill of exchange." Section 1133 provides for bills of lading made to bearer in which title passes by delivery without indorsement. Other sections of the Code provide for delivery of freight upon such bills. If the shipment in the instant case was upon a bill of lading as defined by our statute, it is important to know whether it was to bearer or to order, and, if to order, whether it was indorsed. Ordinarily when a shipper takes such bill to his bank he draws a draft, re-

ceives credit for his draft, and indorses the bill and delivers it to the bank to accompany the draft as security. If the bill is to bearer, then a delivery without indorsement is sufficient to convey title. If that had been the transaction in this case, the Security National Bank of Watertown would be the proper party to bring this action. But there is nothing in the record to show that the shipper's contract was a bill of lading as defined by our statute. The contract is not before us in its entirety, but such parts as are in the record do not indicate it was a bill of lading. That being the case, delivery could be made to Ryan without the production of the contract. This the carrier claims to have done by delivering to Burney as agent of Ryan. What was said earlier in this opinion disposes of the question of Burney's authority.

The judgment and order appealed from are reversed.

POLLEY, CAMPBELL, and BROWN, JJ., concur.

SHERWOOD, J., not sitting.